(C.D. 2307)

## V. G. Nahrgang v. United States

United States Customs Court, First Division

(Decided January 4, 1962)

*John C. Ray* for the plaintiff.

*William H. Orrick, Jr.,* Assistant Attorney General (*Henry J. O'Neill* and *Mollie Strum,* trial attorneys), for the defendant.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) as *amicus curiae.*

Before Oliver, Mollison, and Wilson, Judges

Oliver, Chief Judge: The shipments involved herein consist of polished plate glass of various sizes and less than one-half of 1 inch in thickness. It was classified under the specific provision therefor in paragraph 222 of the Tariff Act of 1930, as modified, and assessed with duty thereunder at the appropriate rate according to size. In addition to his classification and assessment under said modified paragraph 222, the collector regarded the glass in question as "colored"

and, accordingly, imposed an additional duty of 2½ per centum ad valorem under paragraph 224 of the Tariff Act of 1930, as modified by T.D. 52739.

There is no dispute concerning the collector's classification of the present merchandise as polished plate glass under paragraph 222, as modified. Plaintiff claims that the assessment of the additional duty under paragraph 224, as modified, is improper, and contends, as stated in counsel's brief, "that the involved plate glass is not colored, but is a heat absorbing glass, designed for automobile windshield use, and that any tint which may be present in the glass is unsought for and is merely incidental to the heat absorbing properties of the iron oxide present in the glass."

Six witnesses testified herein. Three appeared on behalf of plaintiff and three for the defendant. Following is an outline of the testimony adduced by each of them.

Plaintiff's first witness stated that, since 1926, he has been general sales agent in this country for the Union Commercial des Glaceries Belges, a sales organization in the United States for Belgian manufacturers of glass, and that, since 1942, he has been director in charge of sales of the Franklin Glass Corp. of Butler, Pa., a manufacturer of different kinds of glass, including colored plate glass and heat-absorbing glass.

After identifying samples of the merchandise in question (plaintiff's exhibits 1-A and 1-B), the witness stated that both items are "heat-absorbing glass," which he described as "a type of glass, the purpose of which is to absorb the radiant transmission of the energy of the sun." (R. 8.) One of the samples in evidence (exhibit 1-A) has a greenish tint, and the other (exhibit 1-B) has a bluish tint. The witness further stated that the present merchandise was developed "around 1935 to 1938" (R. 9) for the benefit of the automobile industry, and "since then it has grown more usable in the glazing industry of building." The witness' testimony, explaining the composition of the glass in question, is as follows (R. 27):

Q. Well, what is the composition of this glass, Mr. DeGorter?

   *         *         *         *         *         *         *

A. The raw materials that go into the batch are sand, limestone, dolomite, sodium sulphate, or soda ash, feldspar, carbonate of soda, arsenic, and carbon. Also, some iron oxide, if the sand hasn't got enough iron oxide content.

Q. Well, what are the prospective proportions of these ingredients, Mr. DeGorter?—A. The sand varies from 58% to 68%; light limestone from 8% to 20%; dolomite from 1% to 10%; sodium sulphate from 2% to 3%; carbonate of soda, from 15% to 17%; feldspar, 0.1%; arsenic, 0.2%; and carbon, 0.2%; iron oxide, about 0.4%, and iron oxide is included in that particular batch only if sand and the limestone haven't got enough of a content of iron oxide.

To produce the imported plate glass, the raw materials, in their measured quantity, are mixed in a so-called composition drum and

then gradually fed into a furnace with glass cullets, which are "broken glass from the regular production of the plate glass, from the same plant, generally." (R. 29.) The mixture is melted in a tank and, after the batch is completely cooked, it is allowed to flow out of the tank, by force of gravity, into casting rollers, and then is subjected to the processes of annealing, grinding, and polishing. In that condition, the glass is cut, first, into large pieces and then into sizes "required by the automobile trade," which are the sizes included in the shipments under consideration. During the cooking process, the glass changes its chemical composition, so it is tested every half hour to control the tint, either greenish or bluish, that is desired by the customers. In further testimony, the witness identified samples of colored glass (plaintiff's exhibits 2–A to 2–E, inclusive), which, he stated, are distinguishable from the present merchandise that is never referred to by his customers as colored glass.

On cross-examination, the witness was interrogated concerning the content of iron oxide as an ingredient in the raw materials that produced the imported polished plate glass. In this connection, he stated that the iron oxide is acquired from the sand and lime used, as well as being an additive, and that the use of the specific quantities in the batch composition, resulting in the production of the present merchandise, was to obtain, in the final product, the desired heat-absorbing quality. The witness testified further that the presence of iron oxide in the glass in question "does not necessarily mean that it is of a coloring element at all," that its purpose is "to stop the sun's rays," and that the tint—greenish or bluish—in this glass "is obtained through the length and the heat of the batch, and the flame that is cooking." (R. 51.) Comparing the small piece of tinted glass (defendant's illustrative exhibit A) with the glass in question (plaintiff's exhibit 1–A), the witness stated that "they are about the same." (R. 50.)

On redirect examination, the witness stated that the ingredients, as they were employed to obtain the iron-oxide content, insured better quality control over the ultimate product and that iron oxide is desirable in clear plate glass as an element to prevent solarization of the glass and to enable it to keep its brilliance.

Plaintiff's second witness stated that, since 1926, he has been employed in the glass plant of the Ford Motor Co., having been associated with glass research as chief chemist, and, for the past 6 years, as divisional glass technologist of the glass division, with duties that include writing specifications for glass used in the Ford Motor Co. The witness stated that the Ford Motor Co. does not manufacture heat-absorbing glass, but purchases such glass and fabricates it into laminated and tempered safety glass that is sold to the public as optional equipment for use in glazing automobiles.

The witness described safety glass as a commodity that is made and treated in a manner that cuts down the degree of injury, if the glass should be broken in any manner. To accomplish its purpose, safety glass is made by laminating two pieces of glass with a plastic inner layer, or by tempering to harden the glass, so that, when broken, "it breaks into granular pieces that are not as sharp as ordinary glass." (R. 72.) The plastic inner layer of safety glass is made of vinyl butyral that is free of color, except in portions where color is required in the windshields of automobiles to alleviate glare, which is usually a surface above the eye level. After stating that the basic chemical composition of heat-absorbing glass does not vary among manufacturers that produce such glass for use in automotive windshields, the witness gave the chemical composition of heat-absorbing glass that is purchased by the Ford Motor Co. as follows: Silicon, 72.27 per centum; aluminum oxide, 0.04 per centum; calcium oxide, 11.75 per centum; magnesium oxide, 2.27 per centum; sodium oxide, 13.51 per centum; iron oxide, 0.50 per centum. The witness stated further that "regular" automotive glass purchased by his company has an iron-oxide content of only 0.12 per centum.

Referring to the merchandise in question (exhibits 1–A and 1–B, *supra*), the witness testified that the iron-oxide content in the manufacturing composition batch is not deliberately controlled for coloring purposes, although the tint "does cut out some of the glare, which has an advantage," and that the iron-oxide content in the glass serves to absorb the radiant heat from the sun and impede discoloration of the fabric of automobile upholstery. The witness further stated that all plate glass has some degree of tint in it and identified, as clear plate glass, a "chunk of glass" taken out of the regular plate glass tank of the Ford Motor Co., which has a normal iron-oxide content of between "0.15% to probably 0.2%." (R. 81.) The witness described colored glass as "a glass you could hold up, and looking through the light, it would give you a definite color." (R. 79–80.)

Illustrative of his testimony concerning different kinds of glass, the witness produced several samples which he identified as follows:

Five layers of ⅛-inch thickness clear glass (plaintiff's exhibit 4–A) show a deeper tint than the single layer of ⅛-inch heat-absorbing glass (plaintiff's exhibit 4–B). Explaining the difference in the tint between the two kinds of glass, the witness stated "you're looking through more area of glass, and therefore the tint finally reaches a stage where it becomes a colored glass; but for automotive thickness, why, it is not that definite tint." The clear glass, consisting of five layers, is used exclusively as bullet-resistant glass.

Two pieces of heat-absorbing or tinted glass (plaintiff's exhibits 5–A and 5–B). One piece is ⅛-inch thickness, with visible light transmittance of 73 per centum (exhibit 5–A); the other consists of

a piece of ⅛-inch glass, laminated with another sheet of the same thickness, and having a sheet of plastic in the middle (exhibit 5–B). The laminated pieces, forming a combined thickness of one-fourth of 1 inch, with a light transmittance of 73 per centum, are processed or treated to become safety glass and, in that condition, are used in automobiles. Lamination of the glass reduces light transmission.

Pieces of regular plate glass, not heat absorbing, used in automotive glazing (plaintiff's exhibits 6–A and 6–B). One of them consists of two pieces of ⅛-inch glass that have been laminated with a tinted plastic (exhibit 6–A). The other is regular plate glass with visible light transmission of 87 per centum (exhibit 6–B).

Laminated, colored safety glass (plaintiff's exhibits 7–A, 7–B, and 7–C), consisting of a piece of clear glass, laminated with a piece of colored glass (exhibit 7–A); layers of colored glass, with a transparent plastic in the middle (exhibit 7–B); and two pieces of clear plate glass, with green-colored plastic in the middle (exhibit 7–C).

A "chunk" of glass, taken out of a tank of optical glass (plaintiff's exhibit 8), that is tint-free "to as great an extent as you can get glass."

Glass for building construction (plaintiff's exhibits 9–A, 9–B, and 9–C), which contains a greater degree of metallic oxides to give it its desired quality of opaqueness.

A piece of "laminated safety plate glass, with a colored band inner layer laminated between the glasses" (R. 98) (plaintiff's exhibit 10), that is used for windshields on automobiles. The glasses are heat absorbing, and the color is in the inner layer made of a plastic known as vinyl butyral. Light transmittance of the glass is graduated with 73 per centum of visible light transmittance at the bottom of the glass.

Following his description of the different kinds of glass, represented by exhibits just referred to, the witness produced a chart (plaintiff's exhibit 11), depicting the result of a spectrophotometric analysis of three types of glass (exhibits 6–A, 6–B, and 10, *supra*), showing, in terms of percentage, the light transmittance thereof, which he explained as follows (R. 106):

The chart shows, then, that heat-absorbent glass, although it has the same amount of color as the clear glass with colored plastic—the samples both were 73%—the difference is in the infrared and ultraviolet absorption, which is the reason for using heat-absorbent glass in the cars, and not the visible portion.

The witness further stated that the heat-absorbing qualities of glass are due to the iron-oxide content thereof and concluded his testimony, on direct examination, stating that heat-absorbing glass is not colored glass.

On cross-examination, the witness testified that iron oxide is "a tinting agent, and a coloring agent" (R. 121), that a higher percentage of iron-oxide content will produce greater depth of tint or color in glass, and that the presence of 0.54 per centum iron oxide in a

batch of raw materials used to produce glass would contribute to the heat-absorbing quality, as well as the degree of tint, of the finished product. He stated, further, that tint is a degree of color and that it affects the color of light going through the glass.

Plaintiff's third witness was a chemical engineer, employed in the engineering division of the Chrysler Corp. as a supervisor of its glass laboratory and material section. The witness stated that the Chrysler Corp. does not manufacture glass, but purchases all of the heat-absorbing glass used for glazing its automobiles from the Pittsburgh Plate Glass Co. Based on discussions with domestic and foreign manufacturers of plate glass, the witness testified that the merchandise in question is heat-absorbing glass, which he has never heard referred to as colored glass. He stated further that the heat-absorbing glass used by the Chrysler Corp. has ferrous oxide as an ingredient, which is included in the manufacturing batch either as an additive or as an element in a raw material, and that the use of the ferrous oxide is for the purpose of supplying the glass with properties that enable the glass "to absorb radiant solar energy," although it does impart a tint to the finished product. On cross-examination, the witness stated that "tint is usually referred to as a degree of color." (R. 133.)

Defendant's first witness stated that he has been employed, since 1932, by the Pittsburgh Plate Glass Co., a manufacturer of glass similar to the merchandise in question, and that his present association with the company is as director of the product development department of the glass division, with duties that include technical services to customers, development of new, and modification of old, products, assisting in the direction of research laboratories, and working with the manufacturing division.

The witness testified that the glass in question is colored plate glass, and, in giving his reasons therefor, he testified as follows (R. 157):

* * * Exhibits 1–A and 1–B, which I identify as colored glasses, are glasses where a colorant has been introduced in the batch from which the glass is made for specific functional purposes. Two of the very important functional purposes are, the absorption of solar energy to prevent heat from being generated in the glass and radiant energy passing through the glass, and for the control of brightness and glare with a well recognized pleasing color or tint.

The witness testified, further, that this glass is one-eighth of an inch thick, that it is always used with two pieces, laminated together to become one-fourth of an inch thick, and made into safety glass consisting of "two pieces of this type of glass with just 20/1000 of an inch of a plastic inner layer between the two pieces of glass for safety purposes." (R. 162.) The laminated glass is used for windshields of automobiles, for which purpose it is required, by law "to be over 75 per cent light transparent" (R. 162). Laminating two pieces of

this glass doubles the depth of the color so "from the point of view of the person who buys an automobile, the coloring he sees is what he sees by looking through two pieces of the glass." Asked whether the color or tint in the glass under consideration is incidental to the result sought from this particular type of glass, the witness answered as follows (R. 165) :

I would like to answer your question as carefully as I can. Throughout my 18 years of experience in the field of Solex plate glass, which is our tinted or colored heat absorbing plate glass, universally people have passed judgment on its color, and most often they have wanted it, among other things, because of its color characteristics. The automotive industry, which I know, advertises this glass as tinted glass universally; * * *.

On cross-examination, the witness testified that heat-absorbing glass, such as the glass in question, cannot be made without color to be commercially acceptable plate glass, and explained the reason therefor as follows (R. 169–170) :

* * * One must realize that when you make a glass heat absorbing, you are absorbing the sun's radiant energy, and about one-half of that radiation is in what we call the visible light range, and the other one-half of the sun's energy is in the infra-red, one of the invisible ranges of the sun's radiation. The gentleman is asking me if you could make a glass that is free from color, which would mean complete transmittance in the visible range, and a complete blocking in the infra-red range in order to get anything like the heat absorbing characteristics that exist here. This is not a practical possibility. It is a technical freak that could be done at great cost.

Testifying further, the witness emphasized that the iron-oxide content in plate glass, such as that under consideration, serves a twofold purpose, i.e., that the finished glass will possess adequate heat-absorbing quality and impart to the glass a desired tint or color. Both characteristics are equally important for the glass to become desirable for commercial purposes. The witness stated, further, that the Pittsburgh Plate Glass Co. manufactures heat-absorbing, colored glass, known as "Solex plate glass," with an iron-oxide content of between 0.4 per centum and 0.5 per centum, that is comparable with the glass in question.

Defendant's second witness stated that he is assistant director of research of the Libbey-Owens Ford Glass Co., manufacturer and seller of flat plate glass, and that he has been associated with the company for 30 years, having started as a research chemist in charge of spectrophotometric measurements, "which means measuring light transmittance and color characteristics, and heat flow, and other physical properties of glass." (R. 184.) The witness stated that glass, like the merchandise in question, which is manufactured by his company, has an iron-oxide content of 0.5 per centum and that, commercially, clear plate glass made by his company has an iron-oxide content of "from approximately 1/10 to .13, or 13/100 per cent." (R. 194.)

Referring to the present merchandise, he testified that it is colored glass, that iron oxide is used in the manufacture thereof as a pigment to color the glass, and that the iron oxide is intentionally added under a controlled process, which the witness explained as follows (R. 189) :

The purpose of controlling that process is to control the spectral transmittance and spectral absorbency and reflectant properties of the glass so as to produce a glass which transmits less of the sun's energy. In one case, in the visible, it changes the color. In the infra-red it reduces the amount of energy that is transmitted that is available for creating heat.

Concerning the use of glass, like the present merchandise, which is manufactured by the Libbey-Owens Ford Glass Co., the witness testified as follows (R. 190) :

We combine two nominal eighth inch pieces of glass similar to Exhibits 1–A and 1–B with a piece of plastic, 15/1000 of an inch, to make a laminated safety glass that is used in windshields. Also, it is used in door lights, or has been.

Under questioning by the court, the witness stated that he makes no distinction between colored glass and tinted glass, and that all glass, which is tinted, is colored glass.

Defendant's third witness stated that he has been employed by the Libbey-Owens Ford Glass Manufacturing Co. for 20 years and that, at present, he supervises the eastern regional offices. His testimony, so far as pertinent to the present issue, is merely cumulative of that offered by the previous witness, employed by the same company.

The preponderance in weight of the evidence, as hereinabove reviewed, establishes that the polished plate glass in question, at the time of importation, was tinted with either a greenish or bluish hue and that the tint was deliberately acquired by the addition of a specific quantity of iron oxide, a pigment or coloring agent, which, through a controlled manufacturing process, regulates the degree or depth of tint in the imported plate glass in controversy. The presence of the tint or color in this polished plate glass serves two functional purposes. It imparts to the glass heat-absorbing qualities to absorb the radiant transmission of energy from the sun and also controls brightness with consequent alleviation of glare. Both characteristics are equally important for the glass to be acceptable for its commercial practicability.

Although plaintiff's brief does not argue for application of the rule of commercial designation, counsel, during the course of the trial, stated that "commercial designation is claimed for in this particular issue." (R. 147.) In view of counsel's statement, we give consideration to the subject. In *Neuman & Schwiers Co., Inc.* v. *United States*, 24 C.C.P.A. (Customs) 127, T.D. 48606, the rule of commercial designation is stated as follows:

* * * The Supreme Court * * * as in the noted case of *Two Hundred Chests of Tea*, 9 Wheat. 428, recognized that customs laws were particularly adapted

for use by merchants, and that it might well be that commodities which were well known among those who were engaged in the trade, under a certain designation might not be so known, by those who were not engaged in trade; that the Congress was to be understood as speaking in terms of the trade; and that if an article, although not commonly known as designated by the law, was uniformly, definitely, and generally known by that designation in the trade and commerce of the country, it should be included within the statutory term. This rule has been carried down through the years, continuously. * * *

Proof of commercial designation must be directed to the precise statutory language or designation involved. *United States* v. *Armand Schwab & Co., Inc., et al.*, 30 C.C.P.A. (Customs) 72, C.A.D. 218. Speaking of the requirements to establish commercial designation, the *Armand Schwab & Co., Inc.*, case states that "unless it clearly appears to the contrary, tariff acts are to be construed according to the commercial understanding of the terms employed therein. It is equally true that it will be presumed that the common and commercial meaning of such terms are the same, and that in order to prove commercial designation it must be established that a tariff term has a meaning in the trade and commerce of the United States different from its common meaning and that such commercial meaning is definite, uniform, and general throughout the United States."

The statutory term, or designation, involved herein is colored glass. The record before us does not supply a factual foundation upon which to invoke commercial designation within the requirements enunciated in the cited authorities. The common meanings of words involved in the present controversy are pertinent. Dictionary authorities include the following definitions.

The word, "colored," is defined in Webster's New International Dictionary as follows:

1. a Strictly, having color;—often used in combinations; as, ash-**colored**, warm-**colored**. b More commonly in a restricted sense, having chroma. c Of a color different from the normal; specif., of foliage, etc., of a color other than (the normal) green.

The same dictionary defines the word, "tint," as follows:

1. *n.* A slight coloring; a color, esp. a light color; * * *. 2. A tinge; specif., a pale or faint tinge of any hue; as, white without a tint of yellow.

Agreement between the quoted definitions and the testimony herein lies in the recognition by both sources that "tint" is a degree of color, and that "colored" implies having color.

As early as 1911, in *Davison* v. *United States*, 2 Ct. Cust. Appls. 78, T.D. 31631, the word "colored" was the subject of judicial interpretation. In that case, the merchandise consisted of certain copying paper manufactured from natural barks or reeds that had an inherent color which persisted throughout the manufacturing process and was imparted to the finished product, so that, without the addition of

any added or foreign pigments, the paper so manufactured had a decided tan or buff color. In holding that the paper was properly classifiable as "colored," the appellate court stated as follows:

The appellants do not deny the existence of this color as a quality of the finished paper, but they contend that nevertheless the paper should not be called "colored" because of the fact that its color resulted as a mere incident to the manufacture of the article as paper, and was not produced by any additional application of color. They contend that the word "colored" as here used does not mean simply that the paper should have a color, but also that such color should be produced by some pigment added to the manufacturing process for that purpose, in addition to the materials entering into the production of the article as paper. The Government of course contradicts this definition.

The word "colored" is a participial adjective used frequently and even generally with the meaning of "having a color." The dictionaries sustain this statement. Such a definition of the word is almost invariably the first one given by such authorities. And the origin of the color or the method of its production in the article does not enter into the essential meaning of the term, which taken alone simply describes an existing quality or condition. In general speech, too, if an article has a color it is called colored. This applies with especial force to the paragraph in question which undertakes to describe the article by its qualities rather than by the method of its manufacture. Inasmuch, therefore, as this paper has a color it may aptly be described as colored, and it therefore comes within the description of the paragraph.

The interpretation of the word "colored," as set forth in the *Davison* case, was followed in *Heyliger & Raubitschek* v. *United States*, 11 Ct. Cust. Appls. 90, T.D. 38735. There, the merchandise consisted of certain cotton cloth which, at the time of importation, had been treated with a so-called "fugitive tint," that merely served to assist the weaver in distinguishing between the warp and weft yarns in the process of weaving, and which tint was entirely destroyed in the process of bleaching and dyeing the cloth. After quoting with approval from the *Davison* case, the appellate court, in the *Heyliger & Raubitschek* case, stated as follows:

We therefore conclude that at the time of importation the cloth in question was actually colored cloth within the common acceptation of the term, and the only question which remains is whether its assessment as such should be reversed because of the explanations above set out concerning the manufacturer's object in coloring the warp yarns as aforesaid, and the temporary and incidental character and purpose of the color as part of the fabric.

This question we think must be answered in the negative, for the collector was bound to ascertain the condition of the cloth in respect to color by inspection at the time of its importation and to classify it in this particular according to its characteristics at that time, and since it was then colored its assessment as colored cloth was correct, notwithstanding the fact that the color was not permanent and did not add to the market value of the article. The tariff provision in question prescribes but a single criterion in this particular, and that is whether the cloth is colored or not at the time of its importation. If so, it becomes dutiable as colored cloth, regardless of the means or motive with which it was colored, or the subsequent history of the article as intended by the importers.

The principles announced in the *Davison* and the *Heyliger & Rau-bitschek* cases, *supra*, were adhered to in *Bemis Bro. Bag Co.* v. *United States*, 11 Ct. Cust. Appls. 373, T.D. 39162, and *Balfour, Williamson & Co.* v. *United States*, 11 Ct. Cust. Appls. 368, T.D. 39161. In both of those cases, the merchandise consisted of certain fabrics that had colored stripes, either along the border of, or running through, the goods. The colored stripes formed a relatively insignificant part of the surface of the fabrics and served no useful purpose in the ultimate use thereof. In holding the fabrics to be "colored," the appellate court, in the *Bemis Bro. Bag Co.* case, stated that—

* * * in respect to such partly colored fabrics it is settled that if the colored part thereof be substantial, having reference to appearance, component quantities, and other like considerations affecting the character and condition of the cloth at the time of importation, the cloth itself should be held to be colored within the sense of the act; but on the other hand if the colored part be trifling, insignificant, or negligible, the cloth should be held to be not colored. The question therefore becomes one of fact in each case respecting the actual character and condition of the goods when imported. In this view, if imported goods be colored in a substantial measure according to the foregoing definition, it is not important whether the color be ornamental, or serves a useful purpose, or is permanent, or is visible when in final use, or adds to the marketable value of the goods. For the only question asked by the statute in this particular is one relating to the actual condition of the goods at the time of their importation, and not the motive therefor nor the result thereof.

Under the judicial pronouncements in the cases, immediately hereinbefore reviewed, the polished plate glass involved herein is colored glass. The tariff provision under consideration, like that involved in the *Davison* case, "undertakes to describe the article by its qualities rather than by the method of its manufacture." Hence, it is wholly immaterial whether or not the color in the finished product is incidental in the manufacture of this glass. Paragraph 224, as modified, under which the assessment in controversy was imposed, puts no limitation on the extent to which the glass shall be colored. It is sufficient that, at the time of importation, the glass is colored, which was the condition of the present merchandise, the color having been acquired through a pigment or coloring agent deliberately added and regulated through a controlled process of manufacture.

The discussion in plaintiff's brief concerning laminated glass has no bearing on the present issue. Neither by assessment nor through protest claim is there any suggestion that the imported commodity is laminated glass. It is undisputed that the present merchandise is polished plate glass. However it may have been processed or manipulated after importation, has no bearing on its tariff status.

To support the contention that the glass in question is not colored, plaintiff cites several cases. All of them are distinguishable from the present case, as the following review of each discloses.

In *United States* v. *Schrenk*, 7 Ct. Cust. Appls. 451, T.D. 37013, the merchandise consisted of two sheets of polished cylinder glass glued together. Around the edges, there was a black rim or finish, composed of an adhesive substance, designed to, and which did, prevent dampness from getting between the two plates. In processing the merchandise to its imported condition, the sheets adhered so strongly they could not be separated without breaking, so that the finished product possessed "a much greater power of resistance than either component sheet possessed before the union, thereby increasing or enlarging the scope of their useful or other purposes." The appellate court held that the processing of the components to produce the imported merchandise changed its character as polished cylinder glass to the advanced condition of a manufacture of glass and, therefore, so classifiable. The factual phase, as well as the legal aspects, of the cited case is materially different from that before us in this case.

The case of *Charles C. Perry* v. *United States*, 35 C.C.P.A. (Customs) 129, C.A.D. 383, lends support to our conclusion that the merchandise in question is colored glass. In the *Perry* case, the merchandise consisted of certain hats, composed of paper, of which a preponderance of the fibers in the pulp were subjected to a bleaching process. In holding that the merchandise was properly classifiable under the provision for "Hats * * * composed wholly or in chief value * * * paper * * * if bleached," the court stated that "it is immaterial as to what stage in the production of the hats the bleaching occurred." The conclusion in the *Perry* case is consistent with the pronouncement in the *Davison* case, *supra*, as it held, with reference to the statutory word "colored," that "the origin of the color or the method of its production in the article does not enter into the essential meaning of the term, which taken alone simply describes an existing quality or condition."

In *Vanetta Velvet Corp.* v. *United States*, 24 Cust. Ct. 88, C.D. 1213, the merchandise consisted of certain cloth in which some of the filling threads were dyed in one color, and the remaining filling threads were natural or unbleached. The question presented was whether the cloth was "woven with two or more colors or kinds of filling." The issue required the court to consider the words "bleached," "dyed," "printed," and "colored," as they appear in paragraph 904 of the Tariff Act of 1930, in connection with the cotton cloth provided for therein. No comparable question is presented herein. Hence, that case has no bearing on the outcome of the present one.

Summaries of Tariff Information referred to in plaintiff's brief have no influence in determining the classification of the present merchandise. "At best, the Summary is an opinion or conclusion of some person or persons not necessarily reflecting the intent of the

enactors or negotiators." *Dodge & Olcott, Inc.* v. *United States*, 45 C.C.P.A. (Customs) 113, C.A.D. 683. Extraneous aids, including Summaries of Tariff Information, should be considered only to solve doubt and not to create it. *United States* v. *Kung Chen Fur Corp.*, 38 C.C.P.A. (Customs) 107, C.A.D. 447. The statutory language, or designation, involved herein is free from ambiguity; hence, its judicial interpretation must come from the act itself. *United States* v. *Perry River & Co.*, 41 C.C.P.A. (Customs) 18, C.A.D. 524.

On the basis of the present record, and for all of the reasons hereinabove set forth, we hold the merchandise in question to be properly classifiable as polished plate glass, colored, and, therefore, subject to the additional duty of 2½ per centum ad valorem under paragraph 224, as modified, *supra*, as assessed by the collector.

The protests are overruled and judgment will be rendered accordingly.